# Plaintiff's Exhibit 1

```
              1                                                    3
 1    IN THE UNITED STATES DISTRICT COURT       1         APPEARANCES
 2       FOR THE DISTRICT OF COLUMBIA           2
 3  ------------------------------x             3  ON BEHALF OF PLAINTIFF:
 4  MARY SHIMP,              :                  4     DEBRA SOLTIS, ESQUIRE
 5         Plaintiff, : Case No. 1:18-cv-2872   5     MARCUS MASSEY, ESQUIRE
 6         v.               :                   6     KIYONAGA & SOLTIS
 7  ORACLE AMERICA, INC.,    :                  7     910 17th Street, N.W.
 8         Defendant.   :                       8     Suite 800
 9  ------------------------------x             9     Washington, D.C. 20006
10                                             10     (202) 363-2776
11       Deposition of JENNIFER OLSON          11
12            Washington, D.C.                 12  ON BEHALF OF DEFENDANT:
13        Friday, September 27, 2019           13     ALISON D. KEWER, ESQUIRE
14               10:00 a.m.                    14     ISLER DARE
15                                             15     411 East Franklin Street
16                                             16     Suite 203
17                                             17     Richmond, Virginia 23219
18                                             18     (804) 489-5500
19  Job No.:  264190                           19
20  Pages 1 - 299                              20  Also Present:  MARY SHIMP
21  Reported by:  Alda Mandell, RPR, CRR       21
22                                             22

              2                                                    4
 1     Deposition of JENNIFER OLSON, held at the 1          C O N T E N T S
 2  offices of:                                  2  EXAMINATION OF JENNIFER OLSON      PAGE
 3                                               3     By Ms. Soltis                     7
 4     KIYONAGA & SOLTIS                         4
 5     910 17th Street, N.W.                     5          E X H I B I T S
 6     Suite 800                                 6       (Attached to the Transcript)
 7     Washington, D.C. 20006                    7  OLSON DEPOSITION EXHIBITS         PAGE
 8     (202) 363-2776                            8  Exhibit 1   Document Bates stamped   14
 9                                               9              ORACLE 009132-9255
10                                              10  Exhibit 2   Notice of Deposition     15
11                                              11  Exhibit 3   ORACLE 004044-4045       27
12     Pursuant to Notice, before Alda Mandell, 12  Exhibit 4   ORACLE 009249-9254       53
13  Registered Professional Reporter and Notary Public 13 Exhibit 5   ORACLE 000183-200  76
14  of the District of Columbia.                14  Exhibit 6   ORACLE 002921-2922       99
15                                              15  Exhibit 7   ORACLE 009095-9098      104
16                                              16  Exhibit 8   ORACLE 009100 with attachment 106
17                                              17              in native format
18                                              18  Exhibit 9   ORACLE 008988-8989      111
19                                              19  Exhibit 10  ORACLE 002870-2871      116
20                                              20  Exhibit 11  ORACLE 002082-2093      119
21                                              21  Exhibit 12  ORACLE 001758-1761      134
22                                              22  Exhibit 13  ORACLE 003074           136
```

### Page 53

1  A  I would need to refer to the notes.
2     (Exhibit 4 was marked for identification
3  and is attached to the transcript.)
4  Q  And you -- did you make the redaction or
5  you sent it in full form to your attorneys and
6  discussed the redaction?
7  A  I sent it to him full form.
8  Q  Why -- were you instructed to do the first
9  cut through your notebooks to see what was relevant?
10 A  Yes.
11 Q  Let's talk a little bit about your
12 responsibilities as a VP at Oracle.
13    How long have you been in your current
14 position?
15 A  As a VP or in HR?
16 Q  Tell me your -- the thumbnail version of
17 your career there.
18 A  I joined Oracle in 2005 via acquisition.
19 I was an HR business partner for the Retail Global
20 Business Unit. I think I was promoted about a year
21 later to manager.
22 Q  Uh-huh.

### Page 54

1  A  I don't know if it was a year, to be
2  honest.
3  Q  Uh-huh.
4  A  And progressed, you know, over the last 14
5  years in terms of responsibility from, you know, a
6  manager of our Retail to leading HR for all the
7  Global Business Units in addition to a number of
8  other businesses reporting in to Mark Hurd.
9  Q  Okay. So your responsibilities currently,
10 are they the same as they were back in 2017 or have
11 they changed?
12 A  I think they would predominantly be the
13 same.
14 Q  Your position was the same then as it is
15 now?
16 A  The group team supports might have shifted
17 a bit, but the GBUs were always under me.
18 Q  Okay. And the "GBUs" are the Global
19 Business Units, right?
20 A  Correct. The ones either under Bob Weiler
21 or Mike Sicilia.
22 Q  Okay. Let's talk about in 2017. In 2017

### Page 55

1  your responsibilities for the GBUs as a human
2  resource vice-president at that time were what? If
3  you could just list those responsibilities for me.
4  What were you doing for GBUs?
5  A  Okay. I would have been the HR business
6  partner to the executive vice-president, Bob Weiler.
7  Q  Uh-huh.
8  A  I managed a team that supported all the
9  businesses under Bob Weiler.
10 Q  An HR team you mean?
11 A  Yes, an HR team.
12    I personally was an HR business partner as
13 well to Alec Glorieux and parts of his team.
14 Q  Uh-huh.
15 A  And to Mike Webster in Retail.
16 Q  And what does that mean, to be a business
17 partner, an HR business partner?
18 A  Yeah, it -- what does that mean?
19 Generally it means you're the person that's working
20 directly with the executive regarding any HR
21 employee-related matters. That could be, you know,
22 rolling out salary processes, running talent review

### Page 56

1  boards. It could be running different initiatives,
2  programs.
3     In addition, you know, for the groups you
4  personally are touching, like I said I did regarding
5  parts of Alec's team --
6  Q  Uh-huh.
7  A  -- you would be handling any specific ER
8  or investigation matters at least as a first point
9  of contact.
10 Q  Okay. So you are their human resource
11 clearinghouse for the group that you're personally
12 touching.
13 A  Correct.
14 Q  Is that fair to say?
15 A  Yes.
16 Q  Okay. And Alec's group is -- in 2017,
17 what is the title of the group that he oversees? I
18 see different references throughout the documents,
19 so I'm just seeking some clarity.
20 A  I don't know that there is a specific
21 name. I mean, he has multiple functions, so it's
22 kind of hard to put any one name --

## 69

1  A  Okay.
2  Q  What did you do?  Yeah.
3  A  I looked for any cases related to
4  complaints against Alec.
5  Q  Did you look at any time for any cases
6  within his organization?
7  A  I don't think so.
8  Q  Okay.  So in terms of looking for cases
9  against Mr. Glorieux, did you find any?
10  A  One sort of.
11  Q  Oh, okay.  What's that?  Which one?
12  A  This was a compliance matter.  One of his
13  direct reports, Kirk Fischer --
14  Q  Uh-huh.
15  A  -- had donated $1,000 to the ALS -- I
16  think it was ALS Research Fund after the death of an
17  employee in Mr. Glorieux's organization, and Kirk
18  had done this more or less at Alec's direction.
19      Unfortunately, neither of them understood
20  that our policy was -- I think that the limit was --
21  I think it's $200.  I'm not sure if that's right.
22      And so a compliance issue was raised.  I

## 70

1  had to talk to Alec and Kirk and -- in the end
2  because Alec had told Kirk to do it, Alec just paid
3  the $800.
4  Q  Any other complaints of any kind against
5  Mr. Glorieux?
6  A  No.
7  Q  And by "complaints," just to be clear, I
8  mean, you know, somebody just raising an issue.  I'm
9  not talking about formal complaints.
10     Has any employee raised any issues with HR
11  alleging unfair treatment by Mr. Glorieux?
12  A  No.
13  Q  At any time?
14  A  No.
15  Q  Other than Miss Shimp, of course.  Right?
16  A  Of course.
17  Q  Okay.  And then who is Terri Ruggiero?
18  A  She was a senior director reporting to
19  Jari Peters, who runs GBU Security.
20  Q  Is Jari Peters a man or woman?
21  A  Female.
22  Q  And Terri is a --

## 71

1  A  Female.
2  Q  A female as well.  Okay.
3      And what did she allege?
4  A  She alleged that Jari was creating a
5  hostile work environment based on how she
6  communicated both verbally and via -- in writing.
7  Q  Uh-huh.  And what was the outcome?
8  A  I did the investigation and I didn't find
9  merit to the allegation, that it rose to the level
10  of hostile work environment.
11     However, I did find that Jari's
12  communications could have been more professional in
13  tone for somebody at her level.  And so I had
14  suggested to Alec that we hire an executive coach
15  for Jari, which we did.
16  Q  Was that the first time you recommended
17  hiring an executive coach?
18  A  It is.
19  Q  How about Deena Marchese?  What was her
20  complaint?
21  A  Deena's complaint was -- I'm just trying
22  to recall.  I don't have the specific details.

## 72

1  There definitely were issues she was bringing
2  forward related to her manager, Ben Jackson.
3  Q  And Deena -- tell me where in Alec's org
4  Deena falls.
5  A  So Ben Jackson's a direct report to Alec
6  and Deena reports to Ben.
7  Q  Okay.  And was it a complaint about
8  communications or decision making?
9  A  Like I said, I don't exactly remember.  It
10  definitely had to do with differences of opinions on
11  deals.  I remember some stuff about deals.
12     And it also had to do with, I guess I
13  would say, communication, because I remember there
14  was the part that she said, you know, I don't know
15  why Ben is reminding me about my security updates.
16  I've done my security updates.
17     But it was really -- it was about the
18  communication than it was how the deals were
19  handled.
20  Q  And was Al Glorieux involved in that
21  investigation at all?
22  A  No, not at all.

**117**

1  sorry. (Handing)
2  Q  For the record, Bates stamped 2870 to 71.
3  Series of emails.
4  A  I'm sorry. What was the question?
5  Q  I was just letting you take a look at it.
6  A  Okay.
7  Q  Okay. So coming down to the -- on the
8  first page to the second email that's from you, the
9  second sentence writes, the HGBU doesn't plan to
10 include anyone in the RIF. They have one senior
11 individual we are handling separate to this process.
12    Do you recall what that refers to, or who
13 that refers to?
14 A  Yeah, I don't recall.
15 Q  What does "HGBU" stand for?
16 A  That would be the Hospitality GBU.
17 Q  Okay. And who -- who was the leader of --
18 A  Mike Webster.
19 Q  When you say they have one senior
20 individual we are handling separate to this process,
21 "this process" is the RIF process?
22 A  I would think so.

**118**

1  Q  Okay. Do you have recollection of
2  handling individuals separate from the RIF process?
3  A  I don't know what I meant by "handling
4  separate to the process."
5  Q  Okay. All right. There was another RIF
6  that occurred within Bob Weiler's organization later
7  that spring that you were involved in.
8     Do you recall that?
9  A  Which year?
10 Q  Of 2017.
11 A  What month?
12 Q  Do you recall an additional RIF that year?
13 A  Not specifically.
14 Q  How many RIFs have you been involved with
15 overall at Oracle?
16 A  I couldn't give you a number.
17 Q  Is it more than 10?
18 A  Yes.
19 Q  More than 20?
20 A  Yes.
21 Q  More than 50?
22 A  I don't know.

**119**

1  Q  Okay. All right.
2     (Exhibit 11 was marked for identification
3  and is attached to the transcript.)
4  Q  I'm showing you what has been marked Olson
5  11. For the record, an email from you attaching
6  materials on April 20th, 2017.
7     You see that?
8  A  Yes.
9  Q  Okay. Do you recall what this email was
10 sent by you in connection with?
11 A  This was attached to this (indicating)?
12 Q  Yes, it was.
13 A  Yes. Yes, I recall.
14 Q  It follows. Okay. You recall.
15    What was it in connection with?
16 A  As I recall, Bob Weiler had had a meeting
17 or quarterly business review with Mr. Hurd, and I
18 believe in the context of that meeting Bob made some
19 comments about he didn't understand why we couldn't
20 RIF faster and why we were constrained on age.
21 Q  Mr. Weiler in a conversation with
22 Mr. Hurd. Were you present for that conversation?

**120**

1  A  No.
2  Q  That information got passed on to you how?
3  A  Either via email from Jennifer Burke or
4  verbally from Bob Weiler.
5  Q  Who's Jennifer Burke?
6  A  Mr. Hurd's operations leader.
7  Q  She's not a lawyer, right?
8  A  No.
9     MS. SOLTIS: Okay. I would request that
10 document. We don't have it.
11    MS. KEWER: What document?
12    MS. SOLTIS: Some possible document that
13 Miss Olson just referred to from Jennifer Burke
14 potentially that reflects information from a meeting
15 between Bob Weiler and Mr. Hurd in connection with
16 RIFs in 2017.
17    MS. KEWER: Did she say it was an email?
18 I thought she just said it was a communication.
19    MS. SOLTIS: You said it was either an
20 email or what?
21    THE WITNESS: It was an email.
22    MS. SOLTIS: It was an email. Yes. I

**121**

1 would request that email.
2 BY MS. SOLTIS:
3     Q   Do you recall when, about when, you would
4 have received that email?
5     A   It would have been before this. It
6 wouldn't have been months.
7     Q   Yeah. Did you create this attachment
8 here, this GBU Reduction in Force, or oversee its
9 creation?
10    A   I believe I created it.
11    Q   And you believe it was in response to
12 concerns by Mr. Weiler about two things, the speed
13 of the RIF and why Oracle was constrained by age in
14 connection with the RIF.
15    A   Yes.
16    Q   Okay. In terms of the speed, what was
17 Mr. Weiler hoping to accomplish?
18    A   Reduce cost faster.
19    Q   In terms of his issues with being
20 constrained by age, what do you recall about what he
21 said?
22    A   I really don't recall much more than what

**122**

1 I've shared.
2     Q   Uh-huh. Did you have a conversation with
3 Mr. Weiler about why age does constrain a RIF?
4     A   I am sure we did. Well, I know we had a
5 conversation.
6     Q   Did you have that conversation with him?
7     A   Yes.
8     Q   Okay. That would have been an important
9 conversation, right? You would have been explaining
10 to Mr. Weiler the constraints on the RIF process,
11 right?
12    A   It would have been a conversation, yes.
13    Q   You would have taken notes on that
14 conversation?
15    A   It depends.
16    Q   Depends on what?
17    A   Where I was located, if I was traveling,
18 if he caught me in the car. It would have been a
19 high-level conversation around our RIF process.
20    Q   A high-level conversation on the RIF
21 process. So Mr. Weiler was hoping to reduce
22 employees without being constrained by their age,

**123**

1 correct?
2     A   I don't know if that was his goal. He was
3 questioning our process.
4     Q   And do you recall what you told him about
5 the law in connection with a RIF?
6     A   I do not recall the specifics of the
7 conversation.
8     Q   Do you recall the generalities? What did
9 you tell him?
10    A   I don't recall the specifics of the
11 conversation.
12    Q   I'm not asking for quotes; I'm asking for
13 generally what you recall.
14    A   Generally I don't recall the conversation
15 other than I know I spoke to him.
16    Q   And you know that you spoke about these
17 issues.
18    A   Yes.
19    Q   Were there emails between you and
20 Mr. Weiler about these issues?
21    A   I don't think so.
22    Q   Did you have one conversation with him or

**124**

1 more than one?
2     A   I don't know.
3     Q   And that would have been sometime before
4 you created this document that you circulated in
5 April 2017?
6     A   Not necessarily.
7     Q   I thought you said that this was in
8 connection with comments that had been conveyed to
9 you about Mr. Weiler's concerns with the RIF
10 process.
11    A   But you asked me if it was before I
12 circulated this document.
13    Q   I see. I see.
14        So you may have known about his concerns,
15 created this document and had a conversation with
16 Mr. Weiler after?
17    A   Right.
18    Q   That's possible?
19    A   That's possible.
20    Q   Did you have conversations with anyone
21 else about Mr. Weiler's desire -- or question --
22 strike that.

**125**

1  Did you have conversations with anyone
2  else about Mr. Weiler's questions about whether the
3  RIF process had to be constrained by age?
4  A  Yes.
5  Q  Who did you have those conversations with?
6  A  Vickie Thrasher, my manager, and
7  Joyce Westerdahl.
8  Q  I'm sorry, Vickie Thrasher. Who -- did
9  you mean she was your manager?
10  A  Yes.
11  Q  Okay. And who was the other person?
12  A  Joyce Westerdahl, Vickie's manager.
13  Q  Okay. Who do you report directly to in
14  your role?
15  A  Today?
16  Q  In 2017 who did you report to?
17  A  Vickie.
18  Q  Okay. So when you say she was your
19  manager, that's who you reported directly to?
20  A  Yes.
21  Q  And what conversation did you have with
22  Vickie Thrasher about this?

**126**

1  A  In generalities I let her know that
2  Jennifer Burke was asking me to pull together
3  materials for a meeting with Mr. Hurd and some other
4  individuals, and I asked her -- I don't know if --
5  we discussed what potentially would go into the
6  document -- or the PowerPoint.
7  Q  Did you discuss the specific issue about
8  constraints by age that had been raised with Vickie?
9  A  We would have talked about it, yes.
10  Q  That would have been something you would
11  have seen as a human resource issue that you needed
12  to address, correct?
13  A  Yes.
14  Q  If age were impacted by a RIF, it would
15  raise legal issues, correct?
16  A  It could.
17  Q  It could.
18     And that's why we have this whole Adverse
19  Impact Analysis, to make sure that no protected
20  category of people, of employees, is impacted in a
21  way that the law won't permit, right?
22  A  Correct.

**127**

1  Q  Okay. So you talked to Vickie by phone,
2  or did you have an email exchange, or both?
3  A  I don't recall any email exchange. I know
4  we talked verbally, over the phone.
5  Q  Okay. And do you know when those
6  conversations would have happened?
7  A  I have no idea.
8  Q  And you don't know, I imagine, if you took
9  notes or not.
10  A  I don't know.
11  Q  Well, again, you know, we've already made
12  a request for notes. All of this just highlights
13  the need for a broader search of notes in connection
14  with discussions. And Joyce -- whose last name I
15  didn't catch. Her last name was?
16  A  Westerdahl.
17  Q  And she's two up from you?
18  A  Yes.
19  Q  And what's her title?
20  A  She leads Global Human Resources.
21  Q  She leads Global.
22     And what sort of communications did you

**128**

1  have with Joyce about this issue?
2  A  I just recall that we had a discussion.
3  Q  Okay. One discussion?
4  A  At least one. It could have been two, but
5  I don't recall.
6  Q  Do you recall generally what Joyce's
7  response was to the issues that had been raised by
8  Mr. Weiler?
9  A  I don't.
10  Q  Do you know if anyone ever instructed
11  Mr. Weiler that the law constrains the selection of
12  employees for a RIF?
13  A  I don't know if that was specifically
14  relayed.
15  Q  Were you ever present for any conversation
16  where anyone told Mr. Weiler that the RIF process
17  was in fact constrained by law and that there were
18  factors such as age and other factors that needed to
19  be considered?
20  A  I don't remember the specifics.
21  Q  Were you ever present for a meeting
22  between Mr. Hurd and Mr. Weiler?